UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,                        Case Number 18-50368
                                                          Honorable David M. Lawson

v.

ROBERT A. GROSS,

                Defendant,

In re: ALEC LANG,

                Moving Party.

_____/

## OPINION AND ORDER DENYING ALEC LANG'S MOTION
## FOR RECOGNITION AS CRIME VICTIM

On December 7, 2917, Robert Gross, an attorney, pleaded guilty to one count of wire fraud.

He admitted to executing a scheme to dupe at least four individuals, some of whom were his clients,

into paying over money to two confederates identified by the government only as "Person A" and

"Person B." Gross will be sentenced soon and his victims will be seeking restitution. Alec Lang

has filed a motion contending that he also is a victim of Gross's fraudulent scheme. Lang believes

that he should be included among those who are entitled to restitution for losses caused by Gross's

criminal conduct. The government and Gross disagree, and after hearing Lang's presentation at a

hearing, so does the Court. Lang alleges that he invested money with "Person A" and "Person B"

at Gross's behest, but he has not identified any misrepresentation Gross made to him, or shown that

he was swept up in the scheme that comprises the count of conviction. Lang's motion will be

denied.

I.

Gross was charged in a single-count information with committing wire fraud by "ma[king] false representations to numerous creditors so as to secure funds from those creditors for the benefit of PERSON A and PERSON B." The scheme, as charged, involved a wire transfer of $125,000 "from a bank account belonging to Victim D.A. to a bank account belonging to PERSON A and PERSON B."

The plea agreement Gross signed described specific misrepresentations made to victims "S.G.," "E.H.," "G.G.," and "D.A." In August 2013, Gross induced S.G. to loan Person A and Person B $1.7 million. Gross says that he falsely told S.G. that his loan would be "fully secured" and that it would be repaid "in a matter of days." When the loan was not repaid, Gross told S.G. that more funds would need to be loaned to preserve the investment, or the original funds would be lost. Gross secured a series of additional loans from S.G. by similar representations over several years, eventually amounting to more than $2.6 million.

In June 2016, during a trip to Las Vegas, Gross told another of his clients, D.A., that funds loaned would be used to invest in a medical marijuana business, although he knew that the funds would not be invested in any such business. D.A. advanced $125,000 in funds through Gross, which Person B then used to obtain a gambling marker (a credit line extended by a casino for a customer to use for gambling). During the same trip, Gross told his client E.H. that funds he loaned would be used to pay off equipment liens that would allow for the sale of a business and return of the funds. E.H. advanced $125,000 through Gross, which Person B then used to obtain another gambling marker at the Caesar's Palace casino.

The plea agreement also recites that in March 2016, Gross prepared certain fraudulent documents such as a deed to a condominium owned by victim G.G., whose signature was forged by Person B. The condominium was used as collateral for a loan by Person A and Person B. Gross also notarized false financial statements relating to Persons A and B, and notarized documents with forged signatures purporting to transfer interests in life insurance policies from Person A or Person B, which neither of them had any right to transfer. The plea agreement states that the fraudulent documents were used to obtain other loans for Person A or Person B, but it does not recite any particular facts about the amounts or the identity of the lenders.

Movant Alec Lang submitted an affidavit in which he attested that, between March and May of 2016, he was Gross's client, Gross was his attorney, that he loaned more than $1.6 million to Person A and Person B via deals brokered by Gross, and that he has received only around $100,000 in repayments on those loans. Lang attested that he made the loans "to allow [Person A and Person B] to invest in so called 'viatical settlements,'" and that the loans were made by him "based upon the misrepresentations and false promises made by Defendant Robert. A. Gross."

But Lang did not attest to any specific facts about what "misrepresentations" or "false promises" by Gross induced him to make the loans, and his lawyer was unable to identify any at the motion hearing. However, in his brief in support of the motion Lang described the purported misrepresentations as follows:

> The Defendant [Gross] sought to obtain multiple loans from Lang. Defendant falsely represented that the loan proceeds were to be used to participate in legitimate investments regarding viatical settlements. After the first few loans, Defendant explained that the two alleged investors, [Person A and Person B], needed to "clear markers" in Las Vegas to release additional moneys for the same investment purposes. Further, Defendant stated that without Lang's additional loans, the investors would not be able to make the viatical settlement investments, and the original loans would be left unpaid. In reliance [on] Defendant's misrepresentations,

Alec Lang loaned additional funds. If Defendant had not made materially false representations, Lang would not have loaned any funds, let alone the initial three loans prior to learning of the "markers."

Mot. [2] at 6 (Pg ID 16).

The government submitted with its opposition to the motion a report of a Homeland Security interview with Lang that was conducted during the investigation, which further illuminates the nature of the loan deals, as described by Lang during the interview. Because the government relied heavily on Lang's statement when it decided that Lang was not a victim of the conduct for which Gross is prosecuted, it is quoted at length:

Mr. Lang stated that Robert Gross was his attorney. When Lang was asked if he invested money with Gross he stated he had invested money with him "somewhat directly with him somewhat directly with [the] other two gentlemen that I did meet, and Mr. Lang stated that he understood the investment involved life settlements where actual insurance policies were bought early from someone who is dying. Lang stated that he understood that a lot of times there are premiums due and the extra cash was to pay the premiums. Lang stated that he was told it was a short term "hard money loan" for about a month which he could expect about 10 percent back on his money. Lang stated that the different investments he made with them had different time frames and interest rates expected for his pay outs. Lang said that he has some that are at 20 percent.

Lang stated that "Rob" Gross told him that Homeland Security stopped them at the airport coming back from Vegas. Lang stated that [REDACTED] had a marker at the Wynn casino that [he] needed to pay down before the casino would give access to the rest of the funds.

Lang said that he has promissory notes for the loans. The first loan was for the life settlement policy that he was helping to pay the premium for. The second loan was for different life settlement policies bundled together with premiums due at different times.
. . .
Lang stated that the second life settlement investment he met with them about was about buying out a member of an LLC that owned a policy they were looking to sell. Lang said he was told the potential buyer did not like that a member of the LLC was the policy holder's treating physician because this created a conflict of interest. Lang added that he did not know the name of the treating physician or the names of the people whose life insurance policies he was buying. Lang said that [REDACTED]

and [REDACTED] were part of a group which Gross was not necessarily part of. Lang said that they were Gross's clients in the past for different things and had contacted Gross regarding the investments. Lang said that Gross had checked it out and that it seemed to be a safe investment and a legit thing. Lang added that Gross told him that "it was not a ponzi scheme or anything like that."

Lang stated that he expected some return on the money the week of Memorial Day. Lang explained that he knew of two sets of markers that needed to be released. Lang said that they told him a lot of these life insurance settlements are paid off through the casinos. Lang believed that having the money go through the casinos made sense from a tax [perspective] to avoid having some of the money going to the government. Lang said he was never told the money was needed to pay off gambling debt but instead to pay markers.

Gov't Resp. [4], Ex. A, Report of Investigation dated July 1, 2016 at 2-4 (Pg ID 140-42).

Lang argues that he qualifies as a victim of Gross's fraud scheme because (1) initially Gross represented that loans made by Lang were to be invested in "viatical settlement" instruments (purchases of the right to benefit payments from life insurance policies held by persons expected to die soon); (2) later, after Lang made several initial loans, Gross informed Lang that further loans would be needed to allow the principals of the investment scheme to "clear markers" related to their gambling debts in Las Vegas; and (3) Gross told Lang that without further loans the principals would not have funds available to carry out the initial investment plan, and the original loans would go unpaid. Lang contends that if he had known up front that additional funds would be needed to "clear markers" before the investment plan could proceed, then he would not have made any of the loans, including the initial notes made before Gross's revelation.

Lang argues that his loss was foreseeable by Gross, who acted in the capacity of Lang's attorney and broker for all of the loans, and who knew from the outset how the funds lent actually would be used by the principals of the investment and debt retirement scheme. And he argues that he qualifies as a victim of the common plan or scheme to defraud, notwithstanding that the criminal

information charged a single count naming only other individuals who were deceived in a different scheme, not including Lang.

The government responds that its investigation and inquiry into the circumstances of Lang's investments with Gross indicated that Lang does not qualify as a "victim" of the fraudulent scheme, because during interviews with government agents Lang stated that he understood that the money invested was going to be "routed through casinos" and that some of the money loaned would be used to "clear markers," Lang assumed for the sake of minimizing tax consequences to the participants of the scheme. The government contends that, because Lang conceded that he was informed about the actual use or purpose of the funds loaned, he did not actually rely on any misrepresentations made by Gross, as had other investors who never were informed about the details of the scheme or the use of the funds to clear gambling markers to facilitate other investments.

Defendant Gross advanced similar arguments, adding that the principal reason Lang should not be considered a "victim" of the crimes at issue is that the government has taken the position that he is not a victim, and thus it did not charge him with defrauding Lang.

## II.

The questions presented here are twofold: (1) Is Lang a "victim" of Gross's fraudulent scheme as charged in the information and encompassed by the facts admitted at the guilty plea hearing? and (2) Is Lang entitled to restitution under the applicable statutes? Both questions are related and somewhat interdependent.

## A.

Under the Crime Victims' Rights Act (CVRA), the victim of a crime is entitled, among other things "to full and timely restitution as provided in law." 18 U.S.C. § 3771(a)(6). "A 'crime

victim' is defined under the CVRA as a person 'directly and proximately harmed as a result of the commission of a Federal offense or an offense in the District of Columbia.'" *In re McNulty*, 597 F.3d 344, 349 (6th Cir. 2010) (quoting 18 U.S.C. § 3771(e)). "The requirement that the victim be 'directly and proximately harmed' encompasses the traditional 'but for' and proximate cause analyses." *Id.* at 350 (citations and quotations omitted). The concept of "direct harm" encompasses a "but-for" causation notion that is different from that of "proximate harm," and for both purposes the necessary inquiry is fact-specific. *Ibid.*

Lang argues that he was victimized by Gross, who, together with Person A and Person B, engaged in a series of fraudulent transactions that had some common features. For instance, Lang, like some of the others, was a client of Gross's, a specific kind of investment was identified, additional requests for cash were made after the client parted with his money, and some of the funds were used for gambling markers in Las Vegas. But when determining if Lang is a victim of the crime in *this* case, the Court "must (1) look to the offense of conviction, based solely on facts reflected in the jury verdict or admitted by the defendant; and then (2) determine, based on those facts, whether any person or persons were 'directly and proximately harmed as a result of the commission of [that] Federal offense.'" *Id.* at 351 (quoting *United States v. Atlantic States Cast Iron Pipe Co.*, 612 F. Supp. 2d 453, 536 (D.N.J. 2009) (collecting cases)).

Lang may qualify as a victim "even though [he] may not have been the target of the crime, as long as [he] suffer[ed] harm as a result of the crime's commission.'" *Ibid.* (quoting *In re Stewart*, 552 F.3d 1285, 1289 (11th Cir. 2008)). But the focus must be on the criminal conduct admitted by the defendant, and the effect of *that* conduct on the putative victim. For that question, "the issue becomes whether [the petitioner] was directly and proximately harmed by criminal conduct in the

course of the [crime] or if the actions taken by [the] defendant[] in the underlying case which allegedly harmed [the petitioner] were merely ancillary to the [crime]." *Ibid.*

Looking to the charging document and the plea agreement, the government alleged a fraud — and Gross admitted to conduct — that involved a series of discrete transactions involving some of Gross's clients. Together, the government identified S.G., E.H., G.G., and D.A. as victims, not of a common plan, but as individuals separately harmed by the acts of Gross in league with Persons A and B. There were different representations to different victims, and that is important when assessing Lang's theory of victimhood in this case.

This is not a case like those involving the publication of a uniform set of representations by the defendant to many investors, such as a prospectus used to market publicly traded securities, where circumstantial evidence could be considered to support a conclusion that all of the defendant's investors probably relied on the same false representations to make investments in a bogus enterprise. *C.f. United States v. Stein*, 846 F.3d 1135, 1153-54 (11th Cir. 2017). Here, the Court cannot find that Lang was harmed by distinct representations made to other victims about transactions in which he was not involved. Nor may the Court plausibly conclude that the harm to Lang was a foreseeable consequence of the particular frauds perpetrated by the defendant on other victims by other means. If Lang was a victim at all, it was not of the crime charged or admitted by the defendant.

Lang correctly points out that restitution may be awarded for losses where a victim was injured by fraudulent conduct related to a common scheme, even though the victim was not individually named in a charging document. Restitution even may be ordered for losses to a victim stemming from a common scheme although the specific incidents of conduct that harmed the victim

occurred outside the statute of limitations. *See United States v. Fallon*, 470 F.3d 542, 549 n.12 (3d Cir. 2006) (collecting cases). However, in this case there was no discernible "common scheme" other than in the vaguest and most generalized sense; the "scheme" essentially was a number of serial individualized frauds carried out over a span of years against different victims, accomplished by means of distinctly different misrepresentations. Under those circumstances, the evidence tending to show that the defendant defrauded some victims by some specific representations is not sufficient to warrant a blanket finding by the Court that every person who dealt with Gross in similar transactions during the relevant period of time must have relied on some misrepresentation made by him to their detriment.

Lang has not offered any evidence that he is a victim of the crime for which Gross will be sentenced, or that he otherwise falls within the protection of the CVRA.

## B.

Lang's argument falls short on another point as well. When considering restitution for victims in a fraud case, "a victim's losses may only be included in a restitution award arising from fraud if the victim actually relied on the perpetrator's fraudulent conduct or misrepresentations." *United States v. Teadt*, 653 F. App'x 421, 429 (6th Cir. 2016). Reliance may be established either by "direct evidence that each individual investor [received] the false information and relied on it when deciding to [invest]," or, where the scope of the fraud scheme makes "requiring individualized proof of reliance for each investor . . . infeasible or impossible," then "the government may instead offer specific circumstantial evidence from which the district court may reasonably conclude that all of the investors relied on the defendant's fraudulent information." *Stein*, 846 F.3d at 1153-54 (considering calculation of the loss amount under U.S.S.G. § 2B1.1). Lang has not identified any

representation of Gross that he relied on when parting with his money. And therefore he has failed to "proffer some individualized evidence . . . [that he] was actually a victim." *United States v. Archer*, 671 F.3d 149, 172 (2d Cir. 2011).

The inquiry here must be whether Gross made specific false representations to Lang that were within the scope of the charged offense of wire fraud, and on which Lang actually relied in making the loans that he contends were fraudulently obtained. This is not a case in which it is "clear that no reasonable person would have given the defendant her money if she had known of his plan," such that "a generalized description of the fraudulent scheme is enough to support restitution." *Archer*, 671 F.3d at 172. In fact, Lang's admission that he continued to loan money even after he knew that the funds lent were being used to retire casino markers suggests that he at least found it reasonable to continue investing despite that knowledge, notwithstanding his contention that he would not have advanced the initial loans if he knew about that detail of the investment plan. "[W]here it is plausible that some individuals would have paid the defendant even if they had been informed of his fraudulent plan, then the government must proffer some individualized evidence to meet its burden of showing that each alleged 'victim' was actually a victim." *Ibid.* Evidence that other investors relied on other distinctly different representations does not suffice to support a finding by the Court that all investors must have relied on whatever unspecified representations were made to them. *Stein*, 846 F.3d at 1154.

Moreover, Lang's position that he never was informed about the uses of the loaned funds to retire casino markers until after he made the first few loans is not supported by any actual evidence in the record. Lang's affidavit did not describe in any detail what specific representations or promises he relied upon. He contends that he relied on the omission of the information about casino

markers in making the first few loans, but he has not pointed to any evidence or even any discernible reliable information in the record to support that argument.

Lang's position also is in tension with the information contained in the government's investigation report, which Lang does not challenge, where Lang said that he "knew of two sets of markers that needed to be released," that Gross and the borrowers "told him a lot of these life insurance settlements are paid off through the casinos," and that Lang "believed that having the money go through the casinos made sense from a tax [perspective] to avoid having some of the money going to the government." Those statements contradict Lang's unsupported position that he never would have made any loans if he knew that the funds would be used by the borrowers to pay off gambling markers.

Finally, Lang certainly cannot maintain that he was proximately harmed by any of the misrepresentations specifically described in the information, the plea agreement, or Gross's on-record statements, where those representations were made to other persons and did not have any relation to transactions in which Lang was involved. And the guilty plea's factual basis does not contain any information about representations made to Lang on which he purportedly relied.

III.

In the absence of any positive evidentiary support for Alec Lang's position, and in the face of contradictory information in the record, which he apparently does not dispute, the Court has no plausible factual basis for a finding that Lang actually relied on any specific representation about the use of the loaned funds. The Court therefore cannot conclude that any specific alleged misrepresentation by defendant Gross was the "but for" cause of financial injuries to Lang, or that

he was an actual "victim" of any fraudulent scheme for the purposes of calculating an award of restitution under the CVRA.

Accordingly, it is **ORDERED** that the motion by Alec Lang for recognition as a crime victim and for restitution [dkt. #2] is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  April 17, 2018

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on April 17, 2018.

s/Susan Pinkowski
SUSAN PINKOWSKI
